Rosemary DEAN, Appellant–Petitioner,

v.

William T. PELHAM, Personal Representative of the Estate of William McNatt, Appellee–Respondent.

No. 73A01–0806–CV–306.

Court of Appeals of Indiana.

Dec. 11, 2008.

Publication Ordered Jan. 12, 2009.

[black redaction box]

Amanda O. Blackketter, Robert T. Thopy, McNeely, Stephenson, Thopy & Harrold, Shelbyville, IN, Attorney for Appellant.

Jarrell B. Hammond, Sonia C. Das, Lewis Wagner, LLP, Indianapolis, IN, Robert P. Thomas, Thomas Szostak Thomas & Nugent, Indianapolis, IN, Attorneys for Appellees.

## OPINION

FRIEDLANDER, Judge.

Rosemary Dean appeals the trial court's grant of summary judgment in favor of William T. Pelham, as personal representative of the Estate of William McNatt (the Estate), and the denial of her motion for summary judgment against the same.

We reverse and remand.

The designated evidence reveals that William and Dorothy McNatt moved to Shelbyville from the south side of Indianapolis in 2001. By August 2003, they had been married for fifty years. No children were born of the marriage. William had one sister who was deceased. Rosemary Dean was Dorothy's only surviving sister.[1] Dorothy became terminally ill shortly after moving to Shelbyville. Dean, her husband Bernie, and their daughter Melinda, helped William care for Dorothy until her death on March 14, 2004. Dean and her family maintained a close relationship with William until he died on March 21, 2006. William Pelham and Thomas Pelham are the nephews of William and are William's heirs via intestate succession.

During William's life, he was self-sufficient and took care of all of his financial affairs. There are two bank accounts with Fifth Third Bank that are relevant to this case. The first account, Account 8604, was opened by William and Dorothy on September 22, 1994. William signed the signature card for Account 8604, but Fifth Third had no record of Dorothy ever signing a signature card for the account from the time it was opened until it was closed on November 6, 2003. In any event, the account was titled as a joint account with rights of survivorship. Over the years, both William and Dorothy made regular deposits into Account 8604. On September 13, 2003, William took Dean to the Bank and had her sign a signature card adding her to Account 8604 as a joint owner with rights of survivorship. Dean never made a deposit into Account 8604, nor did she ever withdraw any money from that account.

On October 15, 2003, after a meeting at his apartment with Dustin Pearson, a bank officer for Fifth Third, William opened a second account with Fifth Third, Account 8291. Although Pearson has no recollection of meeting with William, he recognized his own handwriting on all documents pertinent to this appeal. Specifically, on that date, Pearson hand-wrote a check against Account 8604 in the amount of $300,000, which William signed, in order to transfer the funds from Account 8604 to Account 8291. In the memo section of the check are the words "Transfer to [Account 8291]" in Pearson's handwriting.[2] *Appen-*

---

1. Dorothy and Dean also had two surviving brothers out of ten siblings. They are not involved in the matter before us.

2. The remaining balance in Account 8604 was removed from that account by debit memo on November 3, 2003.

*dix* at 314. Pearson also hand-wrote out a signature card for Account 8291 that William subsequently signed. A second signature line on this signature card has markings indicating that a signature of an additional person would be sought, but such signature was never obtained. On this same signature card, the box where ownership of the account would be indicated was left blank, and nowhere else on the handwritten signature card prepared by Pearson is there any indication as to in what manner Account 8291 was to be owned. Pearson could not recall if he asked William how the account was to be titled, but explained that it was his practice to ask a customer if he wanted the new account titled in the same manner as the existing account or if he wanted it titled differently.

After meeting with William, Pearson returned to his Fifth Third branch and entered the information into the computer to set up Account 8291. Pearson explained that when he created the account in the computer system, he created a "name screen", which identifies the parties interested in the account and their respective interests in the account. The name screen Pearson created for Account 8291 labels William and Dorothy as "JOINT", i.e., they were identified as joint owners. *Id.* at 47. Dean's status on Account 8291 is labeled as a "SIGNATOR", rather than as "JOINT", which was her designation on the name screen generated for Account 8604. *Id.* at 47, 43. According to Pearson, he would not have changed Dean's status with respect to Account 8291 to something different than her status under Account 8604 unless specifically instructed to do so by William.

After inputting the information into the computer to open Account 8291, Pearson printed a computer-generated signature card. On this signature card, in the box where ownership is indicated are the words "JOINT—WITH SURVIVOR". *Id.* at 49. Identified above individual signature lines were the names of William, Dorothy, and Dean, with no further designation. No one, including William, ever signed this computer-generated signature card.

On or about November 6, 2003, William went to Fifth Third and met with Aaron Irwin, the branch manager. At William's direction, Irwin hand-wrote on the computer-generated signature card previously printed by Pearson the words "Joint Owner" next to his and Dorothy's names. *Id.* According to Irwin, William instructed him to label Dean as a signor, and Irwin did so by hand-writing the word "Signor" next to Dean's name.[3] *Id.* Irwin testified that a designated "signor" does not have an ownership interest in the account, but that such individual would have the same authority as an owner to make withdrawals from the account, sign checks against the account, and make deposits into the same. Neither Dorothy nor Dean ever signed the signature card for Account 8291,[4] and Fifth Third did not require that their signatures be on file in order for them to have the authority to access the funds in the account. During her life, Dorothy made regular deposits of her social security checks into this Account 8291. Dean

---

**3.** After Account 8291 was created, periodic statements for that account were addressed to "William McNatt or Dorothy L. McNatt by Rosemary Dean". *Id.* at 290–99. Irwin explained that the word "by" preceding Dean's name designated her status as a signor on the account.

**4.** On the signature line provided for William's signature on the computer-generated signature card are Irwin's handwritten words "See attached", referring to William's signature on the signature card that Pearson had filled out by hand. *Id.*

never made any deposits or withdrawals from the account. Indeed, Dean did not know about the existence of Account 8291 until after William's death. Dean was also not aware that William had closed Account 8604.

William had several conversations with various individuals indicating his intentions with regard to who would receive the funds in Account 8291 after his and Dorothy's deaths. Irwin stated that William had told him on at least two separate occasions that his nephews would inherit his money, "even though they probably didn't deserve it". *Id.* at 379. In addition to talking about who would inherit his money, William also discussed with Irwin ways to avoid probate. Irwin could not recall, however, when these conversations took place in relation to William adding Dean to Account 8604 or the creation of Account 8291.

Another Fifth Third employee, Sherry Stewart, often assisted William with his account. Stewart noted that William was never confused about his affairs, but that he was always concerned that he received all of the interest he was supposed to accrue and that his checkbook "balanced to the penny". *Id.* at 340. Stewart stated that at one point William had expressed his dissatisfaction with the amount of interest he was earning on Account 8604. Further, in January or February of 2004, after the creation of Account 8291, Stewart was assisting William with balancing his checkbook when she inquired into how Dorothy was doing because Stewart knew her to be very ill. When Stewart asked William if he had any family other than his wife, William replied that he did not. William then volunteered that all he had was his wife's sister (Dean) and that she would get everything he had.

Melinda Pennycuff, Dean's daughter and William and Dorothy's niece, also main-

tained a close relationship with William and Dorothy until each of their deaths. On March 2, 2004, William asked Pennycuff to come to his apartment. When Pennycuff arrived, William told her he was making her the beneficiary of his union death benefits and of his insurance through the union. William had already partially filled out the union cards with his information and completed the cards by adding Pennycuff's information. William then signed both cards. At the same time, William expressed a desire to leave Pennycuff more, but informed her that she would receive more of his money from her parents, i.e., Dean. After his death, Pennycuff received the union death benefits and the insurance payout.

Both Irwin and Stewart stated in their depositions that William had expressed dissatisfaction with the interest he was earning on Account 8604 and that they had both discussed with William alternatives for earning a higher interest rate on his funds. The record reveals that between September 13, 2003 and October 10, 2003, Account 8604 was earning 0.9 annual percentage yield (APY). Between the time Account 8291 was opened on October 15, 2003 and October 31, 2003, it earned 2.26 APY, or approximately two and a half times the interest earned on Account 8604.

After William's death, Fifth Third released the funds remaining in Account 8291 to the Estate, and the account was closed. On June 9, 2006, Dean filed a complaint asking the trial court to declare that she was the sole surviving party of Account 8291 and was therefore entitled to the balance remaining in that joint account at the time of William's death. The Estate filed its motion for summary judgment on July 19, 2007. Dean filed a motion in opposition to the Estate's motion for summary judgment as well as a cross-motion for summary judgment on October 4, 2007.

The trial court, by special judge Terry Snow, held a hearing on June 4, 2008. On June 9, 2008, the trial court granted summary judgment in favor of the Estate and denied Dean's motion for summary judgment. Dean now appeals.

On appeal from a grant of summary judgment, we apply the same standard applied by the trial court:

> Summary judgment is appropriate "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In our review, we do not reweigh the evidence, and we consider the facts in the light most favorable to the non-movant. The appellant has the burden to prove that the trial court erred when it determined that there were no issues of material fact and that the appellee was entitled to judgment as a matter of law.

*Circuit City Stores, Inc. v. Am. Nat'l Ins. Co.,* 779 N.E.2d 62, 65–66 (Ind.Ct.App. 2002) (citations omitted). In addition, where, as here, the parties filed cross-motions for summary judgment, our standard of review is not altered. *Circuit City Stores, Inc. v. Am. Nat'l Ins. Co.,* 779 N.E.2d 62. "We merely 'consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law.'" *Circuit City Stores, Inc. v. Am. Nat'l Ins. Co.,* 779 N.E.2d at 66 (quoting *City of Gary v. Ind. Bell Telephone Co.,* 732 N.E.2d 149, 153 (Ind.2000)). Likewise, our review is not altered where a trial court enters findings of fact and conclusions of law thereon in granting a motion for summary judgment. *Decker v. Zengler,* 883 N.E.2d 839 (Ind.Ct.App.2008), *trans. denied.* In such context, we are not bound by the trial court's specific findings and conclusions, although they aid our re-view by providing us with a statement of reasons for the trial court's action. *Id.*

In granting summary judgment in favor of the Estate, the trial court entered the following conclusions:

1. Account # 8291 was a joint account between William and Dorothy McNatt.

2. The Plaintiff, Rosemary Dean, was placed on the account as a "signer" merely authorizing her to use the account for the benefit of her sister, Dorothy McNatt, or otherwise for the convenience of William McNatt.

3. William McNatt clearly intended to change Rosemary Dean's status as to his joint account with his wife. He understood his financial affairs and knew about the signature cards. He did not tell his sister-in-law about the accounts [sic] existence.

4. Rosemary Dean is not a "party" to account # 8291 as contemplated by I.C. 32–17–11–7 or the rules of Fifth Third Bank.

*Appellant's Appendix* at 12–13. Dean argues that the trial court erred when it determined as a matter of law that given her status as a "signer" she was not a "party" to Account 8291. *Id.* Claiming that she was a party to Account 8291, Dean further asserts that the Estate failed to prove by clear and convincing evidence that William did not intend for her to have survivorship rights when he created Account 8291.

 Since Indiana's adoption of the Non–Probate Transfer Act, Indiana has operated under a statutory presumption that a survivor to a joint account is the intended receiver of the proceeds in that account. *Decker v. Zengler,* 883 N.E.2d 839 (Ind.Ct.App.2008), *trans. denied; In re Estate of Banko,* 622 N.E.2d 476 (Ind. 1993). That statutory presumption is rooted in Ind.Code Ann. § 32–17–11–18 (West,

Premise through 2008 2nd Regular Sess.), which provides: "Sums remaining on deposit at the death of a *party* to a joint account belong to the surviving *party or parties* as against the estate of the decedent unless there is clear and convincing evidence of a different intention at the time the account is created." (Emphasis supplied). A "party" to an account is defined as "a person who, by the terms of the account, has a present right, subject to request, to payment from a multiple party account." I.C. § 32–17–11–7(a) (West, Premise through 2008 2nd Regular Sess.). The term does not include "a person who is merely authorized to make a request as the agent of another." I.C. § 32–17–11–7(c).

Here, Fifth Third's rules and regulations do not specifically use the term "party" in identifying the rights and interests of persons named on an account. Further complicating matters is that Fifth Third's rules and regulations do not define the rights of a signator to an account. Thus, the issue we must decide is whether Dean's status as a "signor" or "signator" (terms used interchangeably throughout the designated evidence) under Account 8291 made her a "party" to that account, and thus entitled her to the statutory presumption of survivorship rights.

In *Rubsam v. Estate of Pressler*, 537 N.E.2d 520 (Ind.Ct.App.1989), *trans. denied*, this court addressed under the predecessor statute, which was identical to I.C. § 32–17–11–18, whether a signatory to the decedent's account was a party to the account. The court observed that in order for Rubsam to prove that she was a party to the account, she was required to prove

only that she had an interest in the multi-party account by proving either (1) that she had a present interest in the funds immediately prior to the decedent's death such as a present right to withdraw in a joint account, or (2) that she had some other contingent interest in the funds from the account which became vested at the decedent's death. Although Rubsam had never made a deposit into the account, she proved that her status as a signatory provided her with a present right to withdraw funds from the account and that there were sums remaining in the account at the decedent's death. The estate did not dispute these facts. The court further found that there was no evidence that Rubsam was merely an agent for the decedent. The court therefore concluded that the evidence was sufficient to establish that Rubsam was a party to the account, noting next that the burden shifted to the estate to prove the decedent did not intend at the time the account was created for survivorship rights to attach.

Here, it is undisputed that William and Dorothy were joint owners of Account 8291 and that Dean's status on the account was that of signator. It is further undisputed that a signator is not a designation of ownership in the account. Ownership of the account, however, is not the critical inquiry and is not determinative of whether an individual named on the account is a party to that account.[5] To be sure, the statute setting forth the presumption of survivorship rights does not speak in terms of owners or ownership, but rather in terms of a "party" or "parties" to a joint account. *See* I.C. § 32–17–11–18. A "party" to an account is anyone who has a present interest in the funds in the account

---

**5.** The Estate directs us to Fifth Third's rules and regulations, which provide that one becomes an owner of a joint account by signing the signature card. The Estate thus argues that because Dean did not sign the signature

card, she was not an owner of the account and therefore not a party. The Estate, however, improperly equates ownership of the account with being a party to the account.

such as a present right to withdraw. *See id.; Rubsam v. Estate of Pressler,* 537 N.E.2d 520.

In the present case, it is undisputed that William and Dorothy, as joint owners, had a present interest in and right to withdraw from the account. It is further undisputed that Dean, in her capacity as a signator, had the same present interest as William and Dorothy to the extent that she too was authorized to withdraw funds from the account. According to Irwin and Pearson, this was so regardless of their respective ownership interests. Essentially, in this case, there is no difference between the rights of a joint owner and the rights of a signator to the joint account as far as the right to withdraw funds from the account. We therefore conclude that Dean, having established that she had a present right to withdraw funds from Account 8291, was a party to that account as defined by statute. *See* I.C. § 32–17–11–18; *Rubsam v. Estate of Pressler,* 537 N.E.2d 520.

The fact that Dean did not sign the signature card does not change this conclu-sion.[6] Indeed, both Irwin and Pearson[7] testified that at the time of William's death, Dean, as signator, had the same authority as Dorothy (during her life) to make withdrawals from Account 8291, regardless of whether she had signed the signature card.[8]

Dean's status as a "party" to the account could be defeated given evidence showing that she was merely an agent for William. In this regard, the trial court found that Dean's status as a signer merely author-ized her to use the account for the benefit of her sister or for the convenience of William. Essentially, the trial court con-cluded that Dean was an agent for Wil-liam, and therefore not a party. *See* I.C. § 32–17–1 1–7(c). The designated evidence does not support this conclusion. Indeed, there was absolutely no evidence that Dean was listed as a signor for the benefit or convenience of either Dorothy or Wil-liam. Dean never made any deposits into or withdrawals from the account. *See Rubsam v. Estate of Pressler,* 537 N.E.2d

6. The Estate inaccurately states that the *Rub-sam* court "found that Rubsam's act of *sign-ing* the signature card made her as [sic] a party to the account." *Appellee's Brief* at 12 (citing *Rubsam v. Estate of Pressler,* 537 N.E.2d 520) (emphasis in original). The *Rub-sam* language referred to by the Estate is found in section II of the court's opinion addressing the estate's claim that Rubsam did not have standing to file a claim against the estate because she was not the owner of a pecuniary debt which could have been en-forced against the decedent during her life-time and which could have been reduced to a money judgment. In concluding that Rub-sam was a party to the account, the court did not discuss the fact that Rubsam had signed the signature card. The court found Rubsam to be a "party" to the account because (1) she had a present right to withdraw funds from the account, (2) there were sums remaining in the account at the decedent's death, and (3) there was no evidence of an agency relation-ship between Rubsam and the decedent.

7. During one of his depositions, Pearson stat-ed that he "believe[d]" a signor on an account was required to sign the signature card for the account in order to have authority to make withdrawals or do anything with the account. *Appendix* at 484. Pearson's subjec-tive belief about Fifth Third's signature re-quirement is not supported by Fifth Third's Rules and Regulations. We further note that Pearson made numerous other statements in which he indicated that Dean, as a signator, had the authority to make withdrawals from the account regardless of whether she signed the signature card. Irwin likewise confirmed that as a signator, Dean had the same author-ity as the owners to make withdrawals and that her signature on the signature card was not necessary.

8. We note that Dorothy did not sign the signa-ture card for either Account 8604 or Account 8291. Yet, no one would dispute that during her life she was a party to the account, de-spite the fact that she did not sign the signa-ture card.

520 (finding no evidence that Rubsam's unlimited right of withdrawal was merely for the convenience of the decedent or as her agent). In fact, Dean was unaware of the existence of Account 8291 and her status as a signator thereto. This evidence cuts against the court's finding that an agency relationship existed. There was no other evidence tending to establish that Dean was an agent for William.

Given that Dean's status as a signator provided her with the present right to withdraw funds from Account 8291, and the lack of evidence that her authority with respect to that account was limited by the scope of an agency relationship, we conclude that Dean, as a signator to Account 8291 was a "party" to that account. *See* I.C. § 32–17–11–18; *Rubsam v. Estate of Pressler*, 537 N.E.2d 520. Dean was therefore entitled to the statutory presumption of survivorship rights.

This does not end our review. The Estate argues that even if Dean is deemed a "party" to the account, she is not entitled to the sums remaining on deposit because the undisputed evidence shows that at the time William created Account 8291, he did not intend for Dean to have rights of survivorship. To overcome the statutory presumption for survivorship rights, the burden falls upon the Estate to prove by clear and convincing evidence that survivorship was not intended. *See* I.C. § 32–17–11–18; *Rubsam v. Estate of Pressler*, 537 N.E.2d 520.

The Estate argues that the fact William, who was astute with his finances, changed Dean's status from a joint owner to a signator upon creating Account 8291 (which he opened thirty-two days after adding Dean as a joint owner to Account 8604) clearly demonstrates that that he did not intend for Dean to have rights of survivorship. We disagree.

By naming Dean and designating her as a signator to Account 8291, William demonstrated his intent that she retain the present right to withdraw funds from that account and that she therefore retain the rights of survivorship that she enjoyed under Account 8604. In changing Dean's status from joint owner to signator, William changed her ownership interest with respect to Account 8291, but he did not change her status as a party to that account.

Here, we note that there is no designated evidence that anyone ever discussed survivorship rights with William or, for that matter, told William that a signator to the account would not have survivorship rights. The designated evidence also does not indicate that William had a change of heart with regard to who would inherit his money between the time he added Dean to Account 8604 as a joint owner and when he created Account 8291 and designated Dean as a signator to that account. Indeed, the designated evidence demonstrates that after William created Account 8291 he expressed to a bank employee his intention that Dean inherit his money. We also note that the designated evidence demonstrates that William most likely created Account 8291, not to divest Dean of her right to survivorship, but rather to earn substantially more interest on his money. To be sure, William had expressed his dissatisfaction with the interest he was earning on Account 8604, had inquired about other types of accounts earning higher rates, and the interest earned on Account 8291 was more than two and one-half times greater than the interest earned on Account 8604. When he created Account 8291, William named Dean to the account and designated her as a signator thereby giving her the same present right to withdraw funds from that account that she had under Account 8604. In the absence of any evidence tending to establish that Dean was named as a signator to the account merely for the convenience of Wil-

liam or Dorothy or that Dean was to serve as an agent for William or Dorothy, it is clear that William intended Dean to be a party to Account 8291 and that she have rights of survivorship. Thus, the simple fact that William designated Dean as a signator under Account 8291 does not prove by clear and convincing evidence that William's intent when he created Account 8291 was that she not have rights of survivorship.

The Estate also reiterates its arguments that because a signator is not an owner, there can be no rights of survivorship. We rejected these arguments above. In any event, the Estate's arguments in this regard are unavailing as they do not shed light on William's intent at the time he created Account 8291.

Finally, the Estate directs us to evidence that William told Irwin that his nephews would inherit his money after he died. The Estate fails to provide the rest of William's statement to Irwin in that William did not believe that his nephews deserved his money. We further note that Irwin was unable to recall when William made these statements to him in relation to William's adding Dean as a joint owner to Account 8604 or designating Dean as a signator to Account 8291. Such statements therefore do not indicate that at the time William created Account 8291, he did not intend for Dean to have rights of survivorship. Moreover, the designated evidence establishes that after Account 8291 was created, William expressed his intent that Dean inherit his money upon his death when he told Stewart that Dean would get everything he had. Considering the designated evidence in the light most favorable to the Estate, we conclude that the Estate has failed to prove by clear and convincing evidence that William did not intend for Dean to have the sums remaining on deposit in Account 8291 at the time of his death. We therefore reverse the trial court's grant of summary judgment in favor of the Estate.

The designated evidence establishes, as a matter of law, that Dean was a party to Account 8291, and thus, Dean was entitled to the statutory presumption of rights of survivorship. Further, the designated evidence does not clearly and convincingly establish that William's intent was contrary to the statutory presumption of survivorship rights. We therefore conclude that there are no genuine issues of material fact and Dean is entitled to judgment as a matter of law. We remand to the trial court with instructions to grant summary judgment in favor of Dean.

Judgment reversed and remanded.

DARDEN, J., and BARNES, J., concur.

### ORDER

On December 11, 2008, the court handed down its opinion in this appeal marked Memorandum Decision, Not for Publication. The Appellant, by counsel, has filed a Verified Motion to Publish Decision.

Having considered the matter, the Court FINDS AND ORDERS AS FOLLOW:

1. The Appellant's Verified Motion to Publish Decision is GRANTED and this Court's opinion handed down in this cause on December 11, 2008, marked Memorandum Decision, Not for Publication is now ORDERED PUBLISHED.

2. The Clerk of this Court is DIRECTED to send copies of said opinion together with copies of this Order to the Thomson Reuters West Publishing Company and to all other services to which published opinions are normally sent.

FRIEDLANDER, DARDEN, BARNES, JJ., concur.